**SECURITIES and EXCHANGE COMMISSION, Plaintiff,**

v.

**BEAR, STEARNS & CO. INC., Defendant.**

**Securities and Exchange Commission, Plaintiff,**

v.

**Jack Benjamin Grubman, Defendant.**

**Securities and Exchange Commission, Plaintiff,**

v.

**J.P. Morgan Securities Inc., Defendant.**

**Securities and Exchange Commission, Plaintiff,**

v.

**Lehman Brothers, Inc., Defendant.**

**Securities and Exchange Commission, Plaintiff,**

v.

**Merrill Lynch, Pierce, Fenner & Smith Inc., Defendant.**

**Securities and Exchange Commission, Plaintiff,**

v.

**U.S. Bancorp Piper Jaffray, Inc., Defendant.**

**Securities and Exchange Commission, Plaintiff,**

v.

**UBS Warburg LLC, Defendant.**

**Securities and Exchange Commission,**

---

Plaintiff,

v.

Goldman, Sachs & Co., Defendant.

Securities and Exchange Commission,
Plaintiff,

v.

Citigroup Global Markets, Inc. f/k/a
Salomon Smith Barney, Inc.,
Defendant.

Securities and Exchange Commission,
Plaintiff,

v.

Credit Suisse First Boston LLC, f/k/a
Credit Suisse First Boston
Corporation, Defendant.

Securities and Exchange Commission,
Plaintiff,

v.

Henry McKelvey Blodget, Defendant.

Securities and Exchange Commission,
Plaintiff,

v.

Morgan Stanley & Co. Inc., Defendant.

Securities and Exchange Commission,
Plaintiff,

v.

Deutsche Bank Securities,
Inc., Defendant.

Securities and Exchange Commission,
Plaintiff,

v.

Thomas Weisel Partners
LLC, Defendant.

Nos. 03 Civ. 2937 (WHP), 03 Civ. 2938
(WHP), 03 Civ. 2939 (WHP), 03 Civ.
2940 (WHP), 03 Civ. 2941 (WHP), 03
Civ. 2942 (WHP), 03 Civ. 2943 (WHP),
03 Civ. 2944 (WHP), 03 Civ. 2945
(WHP), 03 Civ. 2946 (WHP), 03 Civ.
2947 (WHP), 03 Civ. 2948 (WHP), 04
Civ. 6909 (WHP), 04 Civ. 6910 (WHP).

United States District Court,
S.D. New York.

July 25, 2012.

Wayne M. Carlin, Wachtell, Lipton, Rosen & Katz, New York, NY, James Andrew Meyers, Orrick, Herrington & Sutcliffe, LLP, Alexander Koch, Antonia Chion, Antonia Choin, Yuri B. Zelinsky, Kenneth L. Miller, Mark Alan Adler, Secu-

rities and Exchange Commission, Kara Novaco Brockmeyer, Tracy Linkins Price, Washington, DC, for Plaintiffs.

Dennis J. Block, Cadwalader, Wickersham & Taft LLP, Sarah Loomis Cave, Hughes Hubbard & Reed LLP, Dixie L. Johnson, Fried, Frank, Harris, Shriver & Jacobson, Mitchell A. Lowenthal, Cleary Gottlieb Steen & Hamilton LLP, Maria Ginzburg, Quinn Emanuel Urquhart & Sullivan LLP, New York, NY, Robert Andrew Sacks, Sullivan & Cromwell LLP, Los Angeles, CA, for Defendants.

## MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Nine years ago, the Securities and Exchange Commission ("SEC") announced its much-heralded "Global Research Analyst Settlement" with ten leading investment banks. The resulting consent judgments sought, *inter alia*, to compensate aggrieved investors, untangle investment banking and research, and establish an investor education fund. The background of these related cases and the multitude of challenges in distributing the settlement funds are set forth in detail in *SEC v. Bear, Stearns & Co.*, 626 F.Supp.2d 402 (S.D.N.Y.2009).

Three years ago, this Court lamented that more than $79 million of disgorgement funds intended for aggrieved investors could not be distributed and faulted the parties for failing to anticipate that predicament. *See Bear, Stearns*, 626 F.Supp.2d at 402–20. At that time, this Court transferred those funds to the Department of the Treasury because "[p]ragmatism, simplicity, and the need for finality ... counsel[ed] this denouement."

*Bear, Stearns*, 626 F.Supp.2d at 419. But that was not the end of the story.

More than two years ago, this Court declined to approve the parties' request to permit "research personnel and investment banking personnel to communicate with each other ... regarding market or industry trends, conditions, or developments." (*SEC v. Bear, Stearns & Co.*, 03 Civ. 2937, Order dated Mar. 15, 2010, ECF No. 303.) This Court concluded that the parties' proposal "would deconstruct the firewall between research analysts and investment bankers[,] ... be inconsistent with the Final Judgments[,] and contrary to the public interest." (*SEC v. Bear, Stearns & Co.*, 03 Civ. 2937, Order dated Mar. 15, 2010, ECF No. 303.)

Today, this Court addresses the third facet of the Global Research Analyst Settlement—a commitment to establish a foundation for investor education to be funded with $55 million from the Global Settlement Funds in these cases.[1] The investor education funds were intended to finance efficient, cost-effective programs designed to educate the investing public. A resolution of this aspect of the parties' consent decrees remains elusive.

In its 2009 opinion, this Court recounted the SEC's concept for a grant-making investor education entity, the bureaucratic sabotage of that plan through agency torpor, and the modification of the global settlement ceding the funds to the NASD Investor Education Foundation (now the FINRA Foundation (the "Foundation")). *See Bear, Stearns*, 626 F.Supp.2d at 418–19. At that time, this Court criticized, *inter alia*, the Foundation's ratio of administrative expenses to grant disbursements over the prior three year period. During that period, the Foundation paid $800,000

---

1. The settlements provided for a total of $85 million to be spent on investor education, $30 million of which was earmarked for state investor education programs. *Bear Stearns*, 626 F.Supp.2d at 404 & n. 2. Those funds are not at issue here.

in administrative expenses while disbursing only $6.5 million to grantees, and paid administrative expenses of more than $21,800 per grant, with an average grant totaling $200,000. *See Bear, Stearns,* 626 F.Supp.2d at 418–19. This Court endeavored to prod the SEC into precautionary action, and posed two rhetorical questions: "Is this the efficient and cost-effective program the SEC had in mind when it urged this Court to adopt it? When will the SEC exercise its responsibility to ensure that these substantial sums are expended to educate the investing public?" *Bear, Stearns,* 626 F.Supp.2d at 419. The gambit worked in part.

Over the last three years, the investor education program evolved, and a majority of the corpus has been disbursed. But problems persist.

### BACKGROUND

On April 28, 2003, the SEC brought these actions against the defendant investment banks and two individual analysts alleging that the investment banks "exerted inappropriate influence over captive research analysts, compromising their objectivity and spawning conflicts of interest." *Bear, Stearns,* 626 F.Supp.2d at 404. Concurrent with the commencement of these actions, the parties submitted proposed consent judgments, which included the $55 million commitment to investor education.

On October 31, 2003, this Court approved and entered Final Judgments in the related actions. At that time, this Court also ordered the SEC to submit an "Investor Education Plan" for the use of the $55 million earmarked for investor education. The SEC submitted its plan on February 13, 2004, and this Court approved it on March 25, 2004.

The SEC's February 13, 2004 plan proposed the creation of a new Investor Education Entity organized as a tax exempt organization pursuant to section 501(c) of the Internal Revenue Code. The Investor Education Entity's goal was to "act as a catalyst to facilitate widespread dissemination of neutral, unbiased information designed to equip Americans with the knowledge and skills necessary to make informed investment decisions." *SEC v. Bear, Stearns & Co.,* No. 03 Civ. 2937 and related actions (WHP), 2004 WL 885844, Ex. A at *2 (S.D.N.Y. Mar. 25, 2004). The Investor Education Entity would accomplish this goal largely through grants to eligible entities. The SEC also recommended the appointment of a Chairman of the Board of Directors and an Executive Director for the Investor Education Entity. The Entity expected to "set forth a second, more detailed plan for achieving [its] goal" within the first six months of its operation. *Bear, Stearns,* 2004 WL 885844, Ex. A at *2. In approving the plan, this Court expressed "every confidence that once the Investor Education Entity is established, it will meet and surpass its laudable mandate." *Bear, Stearns,* 2004 WL 885844, at *1.

By May 2005, "bureaucratic inertia" brought the Investor Education Entity to a relative stand-still. *Bear, Stearns,* 626 F.Supp.2d at 418. Instead of serving as a catalyst for investor education needs, the Entity was swamped with " 'organizational difficulties that could not be overcome.' " *Bear, Stearns,* 626 F.Supp.2d at 418 (quoting Transcript dated June 9, 2005 ("6/9/05 Hr'g Tr.") at 6). On May 4, 2005, the SEC asked this Court to approve a revised plan dissolving the Entity and transferring its $55 million corpus to the Foundation. The SEC argued that the Foundation would be an " 'efficient' " and " 'cost-effective' " partner, allowing for the " 'expeditious distribution of investor education funds.' " *Bear, Stearns,* 626 F.Supp.2d at 418 (quoting 6/9/05 Hr'g Tr. 6). The SEC also asserted that it would maintain " 'a continuing oversight role' " over the investor

education funds. *Bear, Stearns,* 626 F.Supp.2d at 418 (quoting 6/9/05 Hr'g Tr. 6).

On September 2, 2005, this Court approved the SEC's revised plan and authorized the transfer of the investor education funds to the Foundation "to award grants pursuant to the guidelines of its grant program." (Order Regarding Investor Education Plan, dated Sept. 2, 2005 (the "Sept. 2, 2005 Order"), ECF No. 137,[2] at 9.) The September 2, 2005 Order requires, *inter alia,* the Foundation to provide the SEC with quarterly reports describing the use of the funds and strategic plans. "Each report shall ... include an accounting of receipts and expenses in reasonable detail." (Sept. 2, 2005 Order 12.) The SEC was directed to review and file the reports with the Court. Beginning in 2006, the SEC filed the quarterly reports, which indicate that the Foundation disburses the investor education funds through (1) a variety of grant programs and (2) a number of "Targeted Projects."

In its grant programs, the Foundation, sometimes in conjunction with a partner organization, accepts proposals for grants and provides successful applicants with funding, project oversight, and technical assistance. For example, under a grant program called "Financial Education in Your Community," the Foundation and United Way Worldwide provide grants to community groups aiming to meet the financial education needs of underserved working individuals and families. (*See* FINRA Investor Education Foundation: Report to the SEC of the Global Settlement Funds for the Quarter and Year Ended December 31, 2011, dated June 14, 2012 (the "Fourth Quarter 2011 Report"), ECF No. 324, at 3.)

In addition to grant programs, the Foundation develops and funds educational or research initiatives known as Targeted Projects, addressing particular investor education needs. The Foundation manages many aspects of the Targeted Projects itself and employs partner organizations to participate in various aspects of the Targeted Projects. One of the Foundation's Targeted Projects is the "Military Financial Education Project." As its name suggests, the Military Financial Education Project aims to identify and meet the financial education needs of members of the United States military and their families. Another Targeted Project—the "Investor Protection Campaign"—is a "research-based campaign ... intended to help investors understand how they might be susceptible to investment fraud and to replace risky investment behaviors with fraud detection and prevention behaviors." (FINRA Investor Education Foundation: Report to the SEC of the Global Settlement Funds for the Quarter Ended September 30, 2011, dated Jan. 23, 2012 (the "Third Quarter 2011 Report"), ECF No. 323, at 5.)

## DISCUSSION

On June 19, 2012, the SEC filed the Foundation's fourth quarter and year ended 2011 report (the "Fourth Quarter 2011 Report"), revealing that as of December 31, 2011, the Foundation had spent (or committed to spend) $44.7 million of the investor education funds. (*See* Fourth Quarter 2011 Report 1.) This represents a significant improvement over the last three years. *See Bear, Stearns,* 626 F.Supp.2d at 418–19. But whether the Foundation's management of the funds measures up to the SEC's promise of a cost-efficient and expeditious disbursement is an open ques-

---

**2.** Unless otherwise indicated, references to "ECF No." are to documents on the *SEC v.*

*Bear, Stearns* docket, 03 Civ. 2937.

tion. The Foundation's operational expenses, opaque project expenditures, internal audits, and the SEC's lack of oversight all contribute to this Court's skepticism.

## I. *Operational Expenses*

An audit by Ernst & Young LLP for the year 2011 reveals that the Foundation had total "expenditures" of just over $16 million. (*See* Financial Statements: FINRA Investor Education Foundation Years Ended December 31, 2011 and 2010 With Report of Independent Auditors, dated June 19, 2012 (the "2010/2011 Audit"), ECF No. 325, at 3.) Of that amount, more than $4.2 million appears to have gone towards "operational expenses" rather than to grantees or Targeted Projects. The $4.2 million includes nearly $3.6 million in services that FINRA provided the Foundation free of charge, such as employee salaries,[3] employee benefits, rent, utilities, and other technology infrastructure costs. (*See* 2010/2011 Audit 3, 13.) Had the Foundation been responsible for its own costs in these areas, it would have distributed roughly seventy-three cents of each dollar directly on its mission programs. Neither the Foundation nor the SEC provides any guideposts to evaluate the efficacy of these expenditures.

## II. *Opaque Project Expenditures*

The amount of money the Foundation spends on a project often seems disproportionately high compared to the nature and scope of the activities undertaken. A few specific expenditures make the point.

### A. *The Investor Protection Campaign in 2011*

In the third quarter of 2011, the Foundation reported spending $683,000 on its Investor Protection Campaign during that quarter. Of that amount, nearly $500,000 was allocated from the investor education funds. The Foundation reported the following Investor Protection Campaign activities for the quarter:

- In August, the Foundation issued a press release and an e-newsletter announcing the launch of the Financial Fraud Research Center at the Stanford Center on Longevity. The Research Center is intended to be a "clearinghouse" for news and research about financial fraud.
- The Foundation's staff hosted or participated in five events relating to the Foundation's "Outsmarting Investment Fraud" initiative. The "Outsmarting Investment Fraud" initiative appears to consist largely of a "curriculum" that includes a thirty to sixty minute presentation on investment fraud and a "Risk Quiz," a self-assessment tool that allows participants to gauge their susceptibility to investment fraud.
- The Foundation's "partners" presented the curriculum to more than 2000 individuals at sixty-three events.
- The Foundation distributed free copies of its "Trick$ of the Trade" DVD, published a series of fraud prevention articles, sponsored a variety of advertising campaigns, and held a "strategy session" to determine how "best to amplify our field-tested messages."

(Third Quarter 2011 Report 5–6.) Fairly read, the report indicates that the Foundation spent $683,000 on a press release, an e-newsletter, five one-to-two-hour events presenting existing programming, various ad campaigns, distributing copies of its

---

**3.** This Court notes that the Foundation apparently has at most five full time staff. (*See* Letter from Terri L. Reicher dated June 19, 2009, ECF No. 284, at 2; *see also* FINRA Investor Education Foundation, *Officers & Staff,* http://www.finrafoundation.org/about/staff/ (last visited July 24, 2012).)

DVDs, a strategy session, and possibly sixty-three partner events. This Court wonders how such a large sum could be spent on a seemingly modest effort.

The Court's September 2, 2005 Order requires the Foundation to include in its quarterly reports "an accounting of receipts and expenses in reasonable detail." (Sept. 2, 2005 Order 12.) The Foundation's report is bereft of the required detail. How much did it cost to hold a "strategy session" or host the events presenting the "Outsmarting Investment Fraud" curriculum? Or to run a radio or television ad? And assuming the Foundation bore all the costs of its partner organizations' sixty-three presentations, is it reasonable that each event cost multiple thousands of dollars, when the average attendance was thirty-two individuals?

In sum, the Foundation's report provides an unelaborated expenditure figure that appears disproportionate to the funded activities. There may be good reasons why the Foundation's activities cost as much as they did, but without a more complete picture of the Foundation's expenditures, any reader is left to wonder.

### B. *The Investor Protection Campaign in 2010*

The Foundation's third quarter 2010 report raises similar questions. During that quarter, the Foundation spent $775,000 on the Investor Protection Campaign, $542,000 of which was allocated from the investor education funds. The Foundation reported the following Investor Protection Campaign activities for the quarter:

- The Foundation distributed 12,000 copies of its "Trick$ of the Trade" DVD along with thousands of copies of its "Fighting Fraud 101" brochure.
- The Foundation developed "infrastructure and web presence" for the Financial Fraud Research Center at the Stanford Center on Longevity.

- The Foundation hosted six events. An event in Baltimore drew 170 attendees who listened to the Foundation's (thirty to sixty minute) Outsmarting Investment Fraud curriculum. A full-day event in Wheeling, West Virginia, titled "Exercising Financial Wellness," drew 130 attendees. In Washington State, the Foundation hosted two events that reached several hundred individuals. In Alabama, the Foundation trained twenty people to be "fraud fighters" and presented the Outsmarting Investment Fraud curriculum to another sixty consumers. And in Florida, the Foundation operated an exhibit booth at the AARP National Conference and presented its (thirty to sixty minute) Outsmarting Investment Fraud curriculum four times.
- The Foundation "launched" its "Operation Fight Fraud," a program designed to encourage AARP members to volunteer and protect others from investment fraud.

(FINRA Investor Education Foundation: Report to the SEC of the Global Settlement Funds for the Quarter Ended September 30, 2010, dated Mar. 7, 2011 (the "Third Quarter 2010 Report"), ECF No. 318, at 5–7.)

Because the Third Quarter 2010 Report provides no detail, this Court is left to make assumptions about the cost of distributing DVDs, developing the research center's website at Stanford, and "launch[ing]" Operation Fight Fraud. Attributing a generous $200,000 of investor education funds to those activities, this Court could infer that the Foundation spent $342,000 hosting and participating in six events during the quarter. That is $57,000 per event. One of the events singled out in the report apparently included nothing more than an exhibit booth and four thirty to sixty minute presentations

about investment fraud. No event had more than 170 attendees. And if the price tag on a "Financial Wellness" seminar in Wheeling, West Virginia is more than twice the price of an average wedding, something arguably is amiss. Of course, the Court's estimates of these costs may be wrong, but the report offers no "reasonable detail" on the matter.

The Third Quarter 2010 Report also makes an oblique reference to "directly reach[ing] more than 1700 older investors through investor forums and other events in our eight primary states." (Third Quarter 2010 Report 6.) But it is not clear who hosted and paid for these events or what the events entailed.

Moreover, how Alabama, Colorado, Florida, Maine, North Carolina, Vermont, Washington, and West Virginia evolved to be the "eight primary states" is a separate question worthy of an explanation from the Foundation and the SEC. The choice does not appear to correlate to those states having the greatest investor education needs. The Foundation, in conjunction with the Department of the Treasury and the President's Advisory Council on Financial Literacy, conducted a National Financial Capability Study (the "Study"), which ranked Vermont among the top five states in "Financial Literacy." *See* FINRA Investor Education Foundation, *States Ranked Most and Least Likely to Engage in Five Key Measures of Financial Capability, available at* http://www.usfinancial capability.org/download/State_rankings_rev_101103v2.pdf. The Study ranked Washington among the top five states in "spending less than . . . household income" and having emergency funds. Washington's "Financial Literacy" score also was well above average. *See* FINRA Investor Education Foundation, *Financial Capability Study*, http://www.usfinancialcapability.org/geo.php?id=Washington (last visited July 24, 2012). By contrast, Montana, which did not make the Foundation's cut, ranks among the bottom five states in three of the five "Key Measures of Financial Capability." FINRA Investor Education Foundation, *States Ranked Most and Least Likely to Engage in Five Key Measures of Financial Capability*. Louisiana, the state ranked lowest in "Financial Literacy," is not among the eight primary states either. The Foundation's choice to favor states whose residents rank among the nation's most financially capable is an unexplained disconnect. In short, the Foundation apparently is not expending the investor education funds where its empirical data suggests it should.

C. *Smart investing@your library Program in 2012*

The Fourth Quarter 2011 Report identifies a list of grants approved under the Foundation's "Smart investing@your library" program. (*See* Fourth Quarter 2011 Report Ex. A.) The "Smart investing@your library" program is one of the Foundation's larger initiatives. On December 13, 2011, the Foundation approved seventeen new grants totaling $1.3 million, and library grant recipients attended a Foundation-led training seminar in Dallas, Texas in January 2012. Many of these libraries do not appear to be in major population areas or places evidencing the greatest need for investor education, and the grants they received could be significant additions to their budgets. Moreover, a random review by this Court of several participating libraries' online event calendars reveals little evidence of any investor education initiatives. And to the extent that some libraries appear to be scheduling investor education events, the disparities in apparent progress among various libraries suggest that the Foundation's and the SEC's oversight of these grants is far from uniform.

For instance, the Genesee District Library in Michigan received a twenty-four month, $91,500 grant to establish a "family financial freedom" education initiative and host "Ask the Expert" financial literacy events. However, the Genesee library's online event calendar reveals only a single event for adults made possible by the Foundation's grant; a program titled "Is Your Money Making You Crazy?" scheduled for September 20, 2012. *See Multiple Branch Schedule of Events,* Genesee District Library, http://www.thegdl.org/ evanced/lib/eventcalendar.asp?ag=&et=& dt=mo&df=calendar&cn=0&private=0& ln=ALL (last visited July 23, 2012). The program is a one and a half hour session with a personal finance columnist offering "tips on how to deal with tough financial times when anxiety threatens to overwhelm you." The only other investor education event attributed to the grant is a program about spending, sharing, and saving for children ages two through five. While there may be benefits to starting investor education early, toddlers seem beyond the pale. Similarly, the online calendar for the Albany County Public Library in Wyoming—which received a twenty-eight month, $29,800 grant for workshops emphasizing personal finance basics, preparing to invest, retirement planning, and debt management—contains no scheduled events related to those topics. *See Events,* Albany County Public Library, http://www. albanycountylibrary.org/events.aspx (last visited July 23, 2012). This Court is mindful that many of these grants have terms of up to twenty-eight months, and that seven months may not be enough time for local libraries to develop and implement meaningful programs from scratch. But if the current pace is any indication of future performance, it is hardly acceptable.

The online calendar for the Richland County Public Library in South Carolina— which received a $78,500 grant—seems more promising. Its online calendar re-

veals a variety of events for adults and families related to its "Growing Savers: Smart Money @ RCPL" program, which is funded by the Foundation's grant. *See Multiple Branches Event Calendar,* Richland County Public Library, http://host6. evanced.info/richland/evanced/ eventcalendar.asp?ag=&et=&df= calendar&cn=0&private=0&ln=ALL (last visited July 9, 2012). The events cover topics such as budgeting, saving, retirement planning, and stock market basics. The library also plans to use its grant funds to partner with the local children's band "Lunch Money" to "write a children's song about money, earning, and saving for the future." (Fourth Quarter 2011 Report 21.) The Foundation is in a better position than this Court to assess what types of programs best serve the investor education needs of local communities. *Cf. Bear, Stearns,* 626 F.Supp.2d at 415 ("Distributing grants and reviewing the effectiveness of their use is not an appropriate use of judicial resources and transforms courts into eleemosynary institutions."). But a song for young children seems well beyond the periphery of those needs.

Further, the quarterly reports provide only vague descriptions about what the recipient libraries actually accomplish with their grant money. While some of the quarterly reports include descriptions about what the libraries propose to accomplish when applying for the grants, the reports provide next to no detail about what the libraries in fact do accomplish after receiving the grants. The Fourth Quarter 2011 Report is typical. In describing the activity in the preceding quarter, the report provides, "Throughout the quarter, Foundation and ALA [American Library Association] staff continued to conduct site visits and provide regular assistance to 34 active, participating libraries. Three library projects reached a suc-

cessful conclusion during this period." (Fourth Quarter Report 2.)

The "Smart investing@your library" website provides detailed information about how participating libraries can put together a "project evaluation plan." *See Evaluation Plan,* Smart Investing @ Your Library, http://smartinvesting.ala.org/apply/evaluation/ (last visited July 24, 2012). Such a plan is necessary because, as the website recognizes, "[s]imply put, the library needs to know if it accomplished what it said it would, with the budget it had, and in the time it had to do it." *Evaluation Plan,* Smart Investing @ Your Library, http://smartinvesting.ala.org/apply/evaluation/ (last visited July 24, 2012). But apart from the conclusory statement that some libraries reached "successful conclusions" during a given quarter, the Foundation's reports provide no information about quantified results and whether participating libraries are living up to their "project evaluation plans." And while a point-by-point rundown of a library's compliance with its "project evaluation plan" is unnecessary in the reports, some highlights would be desirable. After all, how else can the SEC assess what it is getting with a significant portion of the $55 million?

### III. *Internal Audits*

Of course, the Court's concerns about the Foundation's use of the investor education funds are allayed in part by (1) a 2010 internal audit of the Foundation that uncovered no evidence of financial mismanagement and (2) a 2009 internal audit that rated the Foundation's internal financial controls as "strong." The 2010 internal audit, however, is emblematic of other problems. It was conducted after one of the Foundation's board members expressed concern about the administration of a particular grant. The audit uncovered no evidence of financial mismanagement in that particular grant or in any

other grant, but it concluded that the Foundation generally lacked adequate standards and procedures for reporting the progress of ongoing grants to the board. The audit suggested that the Foundation implement a variety of structural and governance changes to remedy these inadequacies, most of which apparently have been implemented.

Some of the inadequacies in the Foundation's reporting structure are troubling. The audit recommended that "Foundation Board and management should engage in discussions regarding specific authorities of staff and what information on status of open grants should be communicated to and/or approved by the Board." (FINRA Investor Education Foundation Report for the Quarter and Year Ended December 31, 2010, dated June 20, 2011, ("2010 Year End Report"), ECF No. 319, Ex. C, at 61.) The audit also recommended that "[g]rant administration standards and procedures for specific tasks should be adequately documented." (2010 Year End Report, Ex. C, at 64.) In other words, for the first five years that the Foundation administered the investor education funds, the board appears to have been largely in the dark about the objective goals and results for grants and projects once they were approved. Moreover, Foundation staff appear to have performed many of their grant-related duties without any sort of formal guidelines in place. In an institution whose primary function is funding and overseeing grants, the need for formal procedures in these areas seems elementary. The Foundation's apparent willingness, prior to this audit, to operate without the discipline of such basic, formal procedures should prompt the SEC to question and assure the "strength" of the Foundation's internal controls. Yet the SEC's apparent lack of concern with these circumstances once again "suggests that the investor education initiative has . . . been relegated to

backwaters at the SEC." *Bear, Stearns,* 626 F.Supp.2d at 418.

## IV. *The SEC's Lack of Oversight*

The SEC has let fall to this Court the task of raising questions about the Foundation's reports, its disbursements, and the results of its funded grants and projects. The SEC appears to place its imprimatur reflexively on each and every quarterly report, no matter the content. This Court once again directs the agency to perform its duty. The "reasonable detail" requirement is an explicit obligation set forth in this Court's September 2, 2005 Order, and it goes to the heart of the SEC's ability and responsibility to oversee the use of $55 million of investor education funds.

At a minimum, the Foundation's reports should contain enough detail to allow the SEC and the Court to identify the cost of discrete components of the Foundation's Targeted Projects without excessive speculation. Without such "reasonable detail," the SEC's assurances that the Foundation provides an efficient, cost-effective, and expeditious means of distributing the investor education funds ring hollow. And it is the SEC, not this Court, that should be asking questions about the "reasonable detail" in these reports in the first instance. After all, along with each report, the SEC files with the Court a Notice of Filing that confirms, "The SEC has reviewed the report and it conforms with the Court's Order of September 2, 2005." (*See, e.g.,* Third Quarter 2011 Report 6.) Given the reports' deficiencies, the SEC's statements leave the Court to question how closely the SEC examines the Foundation's reports.

The SEC's indifference to its oversight responsibility in this matter is also manifested in other ways. In the Report for the Second Quarter of 2011, the Foundation indicated that a board member had raised a concern about the Foundation's Third Quarter 2010 report, which by that time the SEC had filed with this Court. (*See* FINRA Investor Education Foundation Report to the SEC of the Global Settlement Funds for the Quarter Ended June 30, 2011, dated Oct. 28, 2011 (the "Second Quarter 2011 Report"), ECF No. 321, at 6.) The board met telephonically on April 29, 2011 to discuss that concern. But the Second Quarter 2011 Report does not explain what the board member's concern was, or what, if anything, the Foundation did to address it. Of course, it is quite possible that the issue was minor, but that is by no means obvious. Given this Court's assessment of the report, it is reasonable to think that the board member's concern was substantive. At the very least, the fact that a board member had a concern about a report that the SEC filed with this Court should have prompted the SEC to investigate and assure the Court that nothing was amiss. However, neither the SEC's Notice of Filing the Second Quarter 2011 Report nor any subsequent report, including the most recent Fourth Quarter 2011 Report, indicates that it did so. Having been put on notice that something in a report filed with this Court was amiss, the SEC should have followed up.

That is not all. The September 2, 2005 Order requires an independent auditor to audit the Foundation each year. The Order further requires the SEC to file each annual audit with the Court. Yet until June 28, 2012, the most recently docketed audit was for the year 2009. The auditors, Ernst & Young LLP, dated the 2009 audit June 8, 2010, but the SEC did not file it with the Court until March 2, 2011. As far as this Court can discern, the nine month delay was not the result of a meticulous and time-consuming oversight process. And while the SEC filed an audit on June 28, 2012 for the years 2010 and 2011, the September 2, 2005 Order requires "an an-

*nual* audit." (Sept. 2, 2005 Order ¶ 9 (emphasis added).) That the SEC instead—and without explanation—chose to wait until June 2012 to file the 2010 audit reflects an unacceptable nonchalance toward this Court's September 2, 2005 Order.

Despite these shortcomings, the Foundation's Fourth Quarter 2011 Report—although filed on June 19, 2012—provides some details about the Foundation's advertising campaigns that were lacking in the Third Quarter 2011 Report. The Fourth Quarter 2011 Report indicates that the Foundation published its fraud prevention articles through the North American Precis Syndicate; that it aired radio, television, and print advertorials in Alabama, Arizona, Florida, Maine, and Vermont; and that it began a national advertising effort promoting the website *SaveAndInvest.org* and the "Trick$ of the Trade" DVD. The Report also describes the results of an internal follow-up audit. That internal audit found the Foundation to have "Strong Controls" in its grant-making procedures and project oversight. (*See* Fourth Quarter 2011 Report 5.) In particular, the audit found the Foundation's controls to be well-designed, functioning as intended, and capable of providing "reasonable assurance of achievement of the core business objectives of the Foundation." (Fourth Quarter 2011 Report 5.) The Report also hints at a measure of involvement from the SEC. The follow-up audit revealed "one minor, noncritical issue" relating to the Foundation's communication of research methodology limitations, which Foundation staff discussed with the Director of the SEC's Office of Investor Education and Advocacy. (Fourth Quarter 2011 Report 5.)

Nevertheless, the Fourth Quarter 2011 Report is just as opaque about the Foundation's expenditures as prior reports. During the fourth quarter of 2011, the Foundation spent $1.649 million on its Investor Protection Campaign, of which $1.154 million was allocated from investor education funds. This is more than double the amount the Foundation spent on the campaign in prior quarters. (*See, e.g.,* Third Quarter 2010 Report 14 ($775,000 on campaign, $542,000 allocated from investor education funds); Second Quarter 2011 Report 12 ($483,000 on campaign, $338,000 allocated from investor education funds); Third Quarter 2011 Report 13 ($683,000 on campaign, $500,000 allocated from investor education funds)). The Fourth Quarter 2011 Report provides no reasonable details about the cost of any of the Foundation's Investor Protection Campaign activities. The only new activity reported is a conference titled "The State and Future of Financial Fraud" and held at the Sofitel in Washington, D.C. on November 3 and 4, 2011 (the "Conference"). While the report is silent on the matter, if the increase in spending is attributable to the Conference, the SEC should have raised an alarm.

The Conference was hosted by the Financial Fraud Research Center, which is a joint initiative of the Foundation and the Stanford Center on Longevity, and included as speakers and audience participants more than 110 academics, regulators, government personnel, and consumer protection advocates. It featured an address by Mary Shapiro, the SEC chairman who formerly served as FINRA's chief executive officer. The Conference was designed to share research about financial fraud and connect researchers with professionals trained in detecting and preventing financial fraud. But it is concerning that an entity selected to disburse millions of dollars for investor education recovered by an agency of the United States Government would choose to hold a conference at a luxury hotel in Washington, D.C., rather than at the SEC's headquarters or FINRA's offices in the same city. And while the Conference's goals are worthy, they

could also have been achieved by meeting in a government event space. Not surprisingly, the Fourth Quarter 2011 Report does not provide any detail about the costs associated with the Conference. The Foundation's performance in this regard is ironic. Its mission is to educate the investing public—to teach investors what to look for in their financial professionals and help investors ensure that the information they receive from those professionals is fulsome and transparent. Given this mission, the Foundation should be a paragon of transparency and disclosure. The same is true of the SEC—the federal agency responsible for enforcing disclosure requirements. Because the costs of the Conference are in no sense transparent in the Foundation's report, the SEC should provide an itemized list of the costs associated with the Conference.

### CONCLUSION

The Foundation has made progress in distributing the investor education funds over the last three years. Indeed, many of its projects appear worthwhile. Nonetheless, nagging questions about efficiency, cost-effectiveness, and institutional resolve linger. The Court therefore directs both the SEC and the Foundation to comply with this Court's September 2, 2005 Order requiring "an accounting of receipts and expenses in reasonable detail." This requirement is the bedrock on which the ability to monitor the use of investor education funds rests. Given the Foundation's sizeable operational budget, the data should be available and easily compiled.

Accordingly, the SEC and the Foundation are directed to file "an accounting of receipts and expenses in reasonable detail" for the years ended December 31, 2010 and December 31, 2011 by August 31, 2012 and for the six month period ended June 30, 2012 by September 28, 2012. The Foundation is directed to provide information regarding the component parts of FINRA's in-kind operational expenses by August 31, 2012. The SEC is also directed to obtain an accounting of the costs of the Conference from the Foundation and file it with this Court by August 31, 2012.

The Foundation is further directed to explain how Alabama, Colorado, Florida, Maine, North Carolina, Vermont, Washington, and West Virginia were selected as the "eight primary states" in the Foundation's Investor Protection Campaign, and the SEC should provide a statement to the Court as to why it was appropriate to favor these eight states. Finally, the Foundation and the SEC are directed to explain why independent audits have not been filed on an annual basis as required by this Court's September 2, 2005 Order. These reports are also to be filed by August 31, 2012.

Until the last dollar of the investor education funds is disbursed, this Court will remain vigilant and involved. This Court again implores the SEC to do the same.

The Clerk of the Court is directed to file a copy of this Memorandum and Order in each of the above-captioned cases.

SO ORDERED.